IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 2 6 2007

CLERK, U.S. DISTRICT COURT
By _____
              Deputy



SECURITIES AND EXCHANGE COMMISSION,   )
                                      )
                    *Plaintiff,*      )
                                      )
vs.                                   )   Civil Action No.
                                      )
Phillip W. Offill, Jr.,               )
David B. Stocker,                     )   **807 CV 1643 - D**
Curtis-Case, Inc.,                    )
Shane A. Mullholand,                  )
Ryan M. Reynolds,                     )
Timothy T. Page,                      )
Steven P. Fischer,                    )
RSMR Capital Group, Inc.              )
Dissemination Services, L.L.C.,       )
Page Properties, L.P.,                )
ATN Enterprises, L.L.C.,              )
                    *Defendants, and* )
Timothy B. Barham,                    )
Ballad Enterprises, Inc.,             )
Bellatalia, L.P.,                     )
                    *Relief Defendants.*  )

## COMPLAINT

The Plaintiff Securities Exchange Commission ("Commission") alleges:

## INTRODUCTION

1.  The federal securities laws require persons who offer and sell securities of a public

company to file a registration statement for those transactions in order to provide information to

investors about the business operations and financial condition of the company. Persons who

purchase shares from a company with a view to offer or sell the shares for the company in

connection with a distribution of the company's securities, are "underwriters," whose securities transactions must be registered.

2.      Rule 504 adopted as part of Regulation D, 17 C.F.R. § 230.501 et seq. (1999), exempts limited offerings and sales of securities that do not exceed $1,000,000, if, among other things, the offers and sales are made according to state law exemptions from registration so long as sales are made only to accredited investors.  However, the accredited investor exemption under Texas law is not available to purchasers who acquire securities with a view to or for sale in connection with a distribution of securities.  Under Texas law applicable during the time period covered by this complaint, any resale of a security made in reliance on the accredited investor exemption within twelve months of receipt from the issuer is presumed to be with a view to distribution and is not exempt from the registration provisions.

3.      During 2004, the defendants participated in a scheme to evade the registration requirements of the federal securities laws by offering and selling the securities of six companies to the public when no registration statements were in effect for their sales transactions.  Texas residents Shane A. Mullholand ("Mullholand"), Ryan M. Reynolds ("Reynolds"), and Timothy T. Page ("Page") located companies that were interested in raising money by selling shares to investors through the public stock markets, and introduced them to defendant David B. Stocker ("Stocker"), an Arizona attorney specializing in securities law.

4.      Stocker drafted corporate resolutions, subscription agreements, legal opinions, and other documents designed to give the appearance that the companies' offers of shares were limited to accredited investors.  These investors included Page and companies controlled by Mullholand, Reynolds, or Phillip W. Offill, Jr. ("Offill"), who purported to hold the securities for investment.

2

5.      In fact, Page, Mullholand, Reynolds, Offill, Stocker, and entities under their control acted as underwriters of the offerings.  They purchased shares directly or indirectly from one or more of the six companies with a view to distributing the shares to the public and immediately resold the shares to public investors.  No registration statements giving investors information about the business operations of the companies were filed or in effect for these transactions.  These defendants' offers and sales of shares to public investors were the primary means through which Stocker, Page, Mullholand and Reynolds intended to finance and, to a limited extent, did finance the six companies.

6.      Stocker was to receive shares from each of the six companies as compensation for his legal work.  In an effort to circumvent the registration requirement and create the appearance that the shares of each company were issued only to Texas residents, Stocker directed the companies to issue the shares intended for his compensation to one of six Texas corporations or limited liability companies, five of which were controlled by Offill.  In those five instances, Offill, a Texas attorney, used the Texas corporations and limited liability companies to hide Stocker's receipt of the shares from the companies.

7.      Offill participated in the sham transactions designed to evade the registration provisions by signing subscription agreements with each of the five companies and falsely representing that the entities he controlled were purchasing the shares to hold for investment.  In fact, Offill's entities merely took title to the newly issued shares without paying for them, and then immediately transferred the shares to Curtis-Case, Inc., a Colorado corporation controlled by Stocker, and, in one instance, to entities controlled by Mullholand, Reynolds, or Steven P. Fischer ("Fischer"), for further distribution to the public.

3

8.      Mullholand and Reynolds directed the six companies to issue shares to defendants Dissemination Services, L.L.C. ("Dissemination") or RSMR Capital Group, Inc. ("RSMR"), as compensation for the consulting or underwriting services. Mullholand and Reynolds then offered and sold the shares to the public and induced their family, friends and others to purchase the shares.

9.      Mullholand, Reynolds, RSMR, and Dissemination each acted as unregistered broker-dealers by engaging in the business of underwriting public offerings and by inducing the purchase or sale of the securities of the six companies.

10.     ATN Enterprises, L.L.C. ("ATN Enterprises"), a company owned by Fischer, received shares indirectly from three of the six companies in exchange for conducting promotional campaigns to create demand for investors to the purchase shares. ATN Enterprises and Fischer offered and sold the shares of three of the companies. Fischer paid approximately $1 million of the proceeds from his stock sales to defendants Timothy B. Barham ("Barham") and Ballad Enterprises, Inc. as a finder's fee for introducing him to Mullholand and Reynolds.

11.     Page directed two of the six companies to issue shares to him as compensation for consulting and underwriting services that he provided. Page then offered and sold the shares of the two companies through brokerage accounts in his own name and the name of Page Properties, L.P ("Page Properties").

12.     Page and Page Properties acted as unregistered broker-dealers by engaging in the business of underwriting public securities offerings.

13.     As a result of the conduct described in this Complaint, defendants Offill, Stocker, Mullholand, Reynolds, Page, Fischer, Curtis-Case, RSMR, Dissemination, Page Properties, and ATN Enterprises offered and sold unregistered securities in violation of Section 5(a) and (c) of

the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e (a) and (c).  Defendants

Mullholand, Reynolds, Page, RSMR, Dissemination, and Page Properties acted as unregistered

broker-dealers in violation of Section 15 (a)(1) of the Securities Exchange Act of 1933

("Exchange Act"), 15 U.S.C. § 78o(a)(1).

14.     The Commission seeks a judgment against all Defendants permanently enjoining them

from future violations of the federal securities laws, ordering them to disgorge all ill-gotten gains

from the unlawful conduct alleged in this complaint plus prejudgment interest, and to pay civil

monetary penalties for their violations pursuant to Section 20(d) of the Securities Act, 15 U.S.C.

§ 77t (d), and Section 21(d) (3) of the Exchange Act, 15 U.S.C. 78u (d) (3).  The Commission

further requests that the judgment prohibit all Defendants from participating in future penny

stock offerings.  The Commission also seeks a judgment ordering the Relief Defendants,

Barham, Ballad Enterprises, Inc., and Bellatalia L.P., to disgorge funds received from the

defendants' unregistered stock sales.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under the provisions of Section 22(a) of the

Securities Act, 15 U.S.C. § 77v (a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     The Commission brings this action pursuant to authority conferred upon it by Section

20(b) of the Securities Act, 15 U.S.C. § 77t (b), and Section 21(d) (1) of the Exchange Act, 15

U.S.C. § 78u (d) (1).

17.     Defendants, directly and indirectly, singly or in concert, made use of the means and

instrumentalities of interstate commerce, the means and instruments of transportation and

communication in interstate commerce, or of the mails in connection with the acts, practices and

courses of conduct alleged in this Complaint, certain of which occurred within the Northern District of Texas.

18.     Venue is proper in the Northern District of Texas pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77u(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Mullholand, Reynolds and Offill reside within the district, and RSMR, Dissemination, Page Properties, ATN Enterprises, Ballad Enterprises, and Bellatalia transacted business within this district.  Stocker, Fisher, and Barham traveled to, and engaged in business transactions within, this district. Certain of the transactions, acts, practices and courses of business discussed below occurred within this district.

19.     Defendants unless restrained and enjoined by this Court will continue to engage in the transactions, acts, practices and courses of business as set forth in this complaint or in similar illegal transactions, acts, practices and courses of business.

## THE DEFENDANTS

20.     **Phillip W. Offill, Jr.**, age 48, is an attorney who lives in Dallas, Texas, and is admitted to the bar in Texas and Oklahoma.  He was manager and member of two Texas limited liability companies named TGWSS Ventures, L.L.C., and Odyssey Contracting, L.L.C.  At the request of Stocker, he created  three Texas corporations, Steep Blue Holdings, Inc., Crimson City Holdings, Inc., and Classical Movement Holdings, Inc., and served as the sole officer and director of each.

21.     **David B. Stocker**, age 47, is an attorney who lives in Phoenix, Arizona, and is admitted to the Arizona bar.  Stocker is a sole practitioner specializing in securities law.

22.     **Curtis-Case, Inc.** is a Colorado corporation with its principle place of business in Phoenix, Arizona.  Stocker is the president and director of Curtis-Case, Inc.

23.     **Shane A. Mullholand**, age 37, lives in Dallas, Texas.

24.    **Dissemination Services, L.L.C.** is a Texas limited liability company with its principle

place of business in Dallas, Texas. Mullholand is the sole managing member, who owned and

operated Dissemination. However, Mullholand had a verbal agreement to split the profits of

Dissemination equally with Reynolds.

25.    **Ryan M. Reynolds**, age 35, lives in Dallas, Texas. Reynolds is a former stock broker

who was barred from the brokerage industry on January 21, 2003. Reynolds was a member of

and owned Veruschka L.L.C. and Veruschka Consulting L.L.C., which he converted to Bellatalia

L.P. Reynolds' share of the profits from the unregistered stock sales by RSMR Capital Group,

Inc. and Dissemination Services, L.L. C. were paid to Veruschka or Bellatalia.

26.    **RSMR Capital Group, Inc.** is a Nevada corporation with its principle place of business

in Dallas, Texas. Mullholand and Reynolds are shareholders of and operate RSMR.

27.    **Timothy T. Page,** age 57, lives in Austin, Texas. Page is a citizen of Great Britain.

28.    **Page Properties, L.P.** is a Texas limited partnership. Page is the general partner and

controlled the activities of Page Properties.

29.    **Steven P. Fischer**, age 41, lives in Bonita Springs, Florida.

30.    **ATN Enterprises, L.L.C.** is a Delaware limited liability company with its principle

place of business in Bonita Springs, Florida. Fischer is the managing member of ATN

Enterprises.

RELIEF DEFENDANTS

31.    **Timothy B. Barham,** age 39, lives in Henderson, Tennessee.

32.    **Ballad Enterprises, Inc.** is a Texas corporation with its principle place of business in

Rockwall, Texas. Barham is the sole shareholder and operator of Ballad.

33.   **Bellatalia L.P.** is a Texas limited partnership with its principle place of business in

Dallas, Texas.  Reynolds is one of the partners and operated Bellatalia.  Bellatalia was formerly a

Texas limited liability company known as Veruschka, L.L.C. or Veruschka Consulting, L.L.C.

(referred to herein jointly as "Veruschka").

### DEFENDANTS' SCHEME TO OFFER AND SELL UNREGISTERED STOCK

34.   Defendants acting in concert participated in a scheme or plan to complete at least six

offerings in 2004, which are described below.  All of the offerings described below were

offerings of penny stocks, in that the each company's net tangible assets and average revenue

were below the thresholds established under Exchange Act Rule 3a51-1(g), 17 C.F.R. §

240.3a51-1(g) (1993), and the securities traded at a price under $5 per share on all but a few days

since they began trading.

35.   Stocker was introduced to each company by Page, Mullholand or Reynolds.  Stocker

obtained a CUSIP number and trading symbol for each company, which were necessary before

the securities of the company could begin public trading.

36.   Stocker prepared subscription agreements for each of the six offerings, through which

certain investors agreed to purchase stock from the issuers.  RSMR, Dissemination, Page, and

Offill entities appeared in one or more of these subscription agreements in the capacity of the

initial investors, as described for each offering in more detail below.  The subscription

agreements represented that the initial investors were acquiring stock for investment purposes

and not with a view to distribution and had no intention to sell the stock.  In five of the six

offerings, the subscription agreements also represented that the initial investors would hold their

stock for at least 12 months, absent certain delineated but unanticipated changes of

circumstances.  In fact, RSMR, Dissemination, and Page intended to begin selling and did begin

selling their stock to the public almost immediately after they acquired the stock, as quickly as market conditions would allow. Offill through his entities transferred his stock to Stocker's control as quickly as possible, often signing transfer documents before the stock was issued, and Stocker intended to sell and did sell his stock to the public as quickly as market conditions would allow.

37.     Stocker also prepared corporate resolutions authorizing the issuance of shares of each company and opinion letters stating the shares were issued pursuant to Rule 504 of Regulation D, 17 C.F.R. §230.504. Stocker introduced the companies to transfer agents and prepared instructions to the transfer agent for the issuance of shares to the defendants.

38.     Stocker was compensated for his legal services by the issuance of shares by the companies. Stocker directed the companies to issue his shares to one of six Texas entities in order to hide his participation as a non-Texas resident in the offerings. Stocker's shares were immediately transferred from the Texas entity to Curtis-Case.

39.     Stocker had trading authority over brokerage accounts of Curtis-Case at three brokerage firms, Spencer Edwards Inc. in Englewood, Colorado, J. Alexander Securities in Los Angeles, California, and SAMCO Financial Services, Inc. in Phoenix, Arizona.

40.     Stocker was a substantial participant in the offers and sales of the securities of the six companies discussed below because he negotiated the terms of compensation for his legal services, took possession of the stock certificates, using interstate commerce or the mails caused the certificates to be deposited into Curtis-Case's brokerage accounts, and ordered the brokerage firms to sell the securities. Stocker wire transferred proceeds from the sales of the securities to bank accounts in the name of Curtis-Case from which he paid expenses for his personal benefit.

41.     Stocker and Curtis-Case were underwriters who received shares indirectly from the six companies with a view to distribution of the shares in exchange for legal services provided to the companies, and who offered and sold the shares for the issuer in connection with a distribution of the shares.

42.     Offill was an underwriter who participated in the distributions by purchasing shares, through entities that he controlled, from five of the six companies with a view to offer and sell the shares to Curtis-Case or others in connection with the distribution of the company's shares to public investors.

43.     Mullholand and Reynolds had trading authority over the brokerage account of RSMR at Bishop Rosen & Co., a brokerage firm in New York, New York, and five brokerage accounts of Dissemination at five brokerage firms, Bishop Rosen & Co., J. Alexander Securities in Los Angeles, California, WestPark Capital Inc. in Los Angeles, California, Newbridge Securities in Fort Lauderdale, Florida, and Franklin Ross in Sarasota, Florida.

44.     Mullholand and Reynolds were substantial participants in the offer and sale of the securities of the six companies because they negotiated the terms of the offerings, took possession of the stock certificates, used interstate commerce or the mails to cause the stock certificates to be deposited into brokerage accounts, ordered the brokerage firms to offer and sell the securities, and induced other persons to purchase the shares.  Mullholand placed most of the orders to sell securities in the brokerage accounts of Dissemination and RSMR.  Reynolds occasionally placed some of the orders to sell.  Actions performed by Mullholand were done with the knowledge of Reynolds and for the benefit of both Mullholand and Reynolds.  Actions performed by Reynolds were done with the knowledge of Mullholand and for the benefit of both Mullholand and Reynolds.

45.     After paying expenses, Mullholand and Reynolds split the profits from the securities sales by Dissemination and RSMR.  From approximately March 26, through November, 4, 2004, Mullholand transferred Reynolds' share of the profits from Dissemination of at least $3,090,550 to Bellatalia L.P. or Veruschka LLC, and transferred his own share of the profits from Dissemination or RSMR of at least $3,068,100 to himself or Bach Investments, Inc., a Texas corporation that he owned.

46.     Dissemination, RSMR, Mullholand and Reynolds were underwriters who acquired shares directly or indirectly from the six companies with a view to offer or sell the shares for the companies in connection with the distribution of each company's shares.

47.     Page and Page Properties were underwriters who acquired shares directly or indirectly from two of the six companies with a view to offer or sell the shares for the companies in connection with the distribution of each company's shares.

48.     Page had trading authority over a brokerage account in his name at J. Alexander Securities in Los Angeles, California and over the brokerage account of Page Properties at Bishop Rosen & Co. in New York, New York.

49.     Page ordered transactions in his own account and was a substantial participant in the offers and sales made by Page Properties.  Page negotiated the terms of the offerings, took possession of the stock certificates, used interstate commerce or the mails to cause the stock certificates to be deposited into brokerage accounts, and ordered the brokerage firms to offer and sell the securities.

50.     Fischer and ATN Enterprises were underwriters who acquired shares indirectly from three of the companies with a view to offer or sell the shares for the companies in connection with the distribution of each company's shares.

51.     Fischer had trading authority over the brokerage accounts of ATN Enterprises at J. Alexander Securities in Los Angeles, California, WestPark Capital Inc. in Los Angeles, California, Newbridge Securities in Fort Lauderdale, Florida, and Franklin Ross in Sarasota, Florida.

52.     Fischer was a substantial participant in the offers and sales made by ATN Enterprises. Fischer negotiated the terms of the compensation, took possession of the stock certificates, used interstate commerce or the mails to cause the stock certificates to be deposited into brokerage accounts, and ordered the brokerage firms to offer and sell the securities.

### 1.     American Television & Film Company Stock Offering

53.     In 2004, **American Television & Film Company** ("ATFT") was a Texas corporation with its principal place of business in Dallas, Texas.  Thomas L. Habeeb ("Habeeb") was the president and a director of ATFT.

54.     In or about February 2004, Habeeb met with Reynolds and Mullholand to discuss ways to obtain financing for ATFT to produce low budget film and television programs. Reynolds and Mullholand agreed to raise up to $1 million for ATFT in exchange for ATFT issuing shares to companies owned by Mullholand and Reynolds.

55.     Reynolds and Mullholand introduced Habeeb to Stocker, who traveled from Phoenix, Arizona to Dallas, Texas to meet with them.  Mullholand and Reynolds instructed Habeeb to use Stocker to prepare the paperwork for the shares of ATFT to be publicly traded.

56.     After the initial meeting, Habeeb communicated with Stocker by telephone regarding preparation of the documents necessary to issue ATFT securities.  Stocker received instructions from Reynolds and Mullholand on the names of shareholders and the amount of ATFT shares to be issued.

57.     On or about March 29, 2004, Stocker prepared corporate resolutions and subscription agreements that authorized the issuance of 9,200,000 ATFT shares in total to RSMR, Dissemination, and E Learning Systems, Inc.  Stocker faxed the documents to Habeeb, and directed him to sign the agreements and return them by fax.  The subscription agreements represented that RSMR, Dissemination, and E Learning Systems had made full payment for the stock.  In fact, RSMR had only paid $30,000 to ATFT.  Dissemination and E Learning Systems had paid no funds to ATFT.

58.     On or about April 2, 2004, Stocker faxed instructions to ATFT's transfer agent to issue 6,000,000 shares to RSMR, 2,000,000 shares to Dissemination, and 1,200,000 shares to E Learning Systems.

59.     On or about April 5, 2004, Stocker faxed instructions to the transfer agent requesting it to cancel E Learning Systems' certificate and reissue 400,000 of the 1,200,000 ATFT shares to Curtis-Case, Inc.  The remaining shares were reissued in equal amounts to E Learning Systems and another company.  The 400,000 ATFT shares issued to Curtis-Case represented part of Stocker's fee for legal work.

60.     On or about April 8, 2004, Stocker deposited the certificate for 400,000 ATFT shares into Curtis-Case's brokerage account with Spencer Edwards Inc.

61.     Between April 8, and April 20, 2004, Stocker offered and sold 400,000 ATFT shares from Curtis-Case's brokerage account at prices ranging from $0.050 to $0.14 for proceeds of approximately $26,444.

62.     On or about April 8, 2004, Mullholand and Reynolds deposited the certificate for 6,000,000 ATFT shares into the brokerage account of RSMR with Bishop Rosen & Co.

63.    On or about April 8, 2004, Mullholand and Reynolds deposited the certificate for

2,000,000 ATFT shares into Dissemination's brokerage account with WestPark Capital Inc.

64.    Between April 8, and  29, 2004, Mullholand and Reynolds offered and sold 961,000

shares of ATFT from Dissemination's brokerage account at prices ranging from $0.050 to $0.37

for proceeds of approximately $160,651.

65.     Between April 14, and August 4, 2004, Mullholand and Reynolds offered and sold

2,153,198 ATFT shares from RMSR's brokerage account at prices ranging from $0.03 to $0.038

for proceeds of approximately $130,750.

66.    No registration statement was filed or in effect for these offers and sales of ATFT shares

by Mullholand and Reynolds through RSMR and Dissemination, or by Stocker through Curtis-

Case.

67.    Mullholand and Reynolds advised their friends and family members when trading

commenced, and induced them to purchase the ATFT stock that they and Stocker were selling.

All of the ATFT stock that RSMR and Dissemination sold on April 8, 2004 was purchased by

friends and family members of Reynolds and Mullholand.  Friends and family members

accounted for over 65% of the total publicly reported purchase volume during the first four days

of trading of ATFT stock, during which time the stock price doubled to $0.10 per share.

Reynolds, through his Veruschka account, purchased 125,000 shares of ATFT stock in market

trades during April 2004 while he, Mullholand, and Stocker were selling.

### 2.    Ecogate, Inc. Stock Offering

68.    In 2004, **Ecogate, Inc.** ("Ecogate") was a California corporation with its principal place

of business in Glendale, California.

69.     In December 2003, Page entered into an agreement with Ecogate to raise money for the company through a public stock offering under Rule 504 of Regulation D.  Page contacted Stocker to prepare documents for the stock offering, and contacted Mullholand about Dissemination performing a market awareness campaign for the company.

70.     On or about April 28, 2004, Stocker prepared corporate resolutions and subscription agreements that authorized the issuance of a total of 10,000,000 Ecogate shares to TGWSS Ventures, LLC, Page, and Dissemination.

71.     On April 28, 2004, Ecogate issued 750,000 shares to TGWSS Ventures, LLC, a Texas limited liability company of which Offill was a member and manager.  Ecogate issued 4,250,000 shares to Page and 5,000,000 shares to Dissemination on May 5, 2004.  The subscription agreements represented that TGWSS Ventures, Page and Dissemination had each made full payment for the stock.  In fact, TGWSS Ventures paid nothing for the stock.  Page and Dissemination had paid $42,500 and $25,000 respectively to Ecogate for the stock.

72.     On May 7, 2004, Stocker delivered to Ecogate's transfer agent the 750,000 shares issued to TGWSS Ventures and a blank stock power signed by Offill along with Stocker's instructions to transfer all 750,000 shares to Curtis-Case.  Stocker instructed the transfer agent to send the 750,000 shares to Spencer Edwards Inc., and the stock was deposited into the brokerage account of Curtis-Case.

73.     Between May 10 and June 14, 2004, Stocker offered and sold the 750,000 Ecogate shares through Curtis-Case's brokerage account for proceeds of approximately $79,221.

74.     Page deposited his 2,000,000 Ecogate shares into a brokerage accounts in his own name at J. Alexander and in the name of Page Properties LP with Bishop Rosen & Co.

75.     From May through December 2004, Page offered and sold approximately 1.7 million Ecogate shares from these accounts for proceeds of approximately $188,276.

76.     Dissemination deposited its 5,000,000 shares into its brokerage accounts at Bishop Rosen and J. Alexander.

77.     Between May and December, 2004, Mullholand and Reynolds offered and sold 4 million shares from the two brokerage accounts of Dissemination for proceeds of approximately $383,885.

78.     No registration statement was filed or in effect for these offers and sales of the Ecogate shares by Page and Page Properties, by Mullholand and Reynolds through the Dissemination account, or by Stocker through the Curtis-Case account.

79.     Mullholand and Reynolds advised their friends and family members when trading commenced, and induced them to purchase the Ecogate stock that they, Page, and Stocker were selling.  Reynolds personally purchased 250,000 shares of Ecogate on May 7, 2004.  That purchase coincided with a sale by Dissemination, and was one of the first trades that ever occurred for Ecogate stock.  Almost all of the Ecogate stock that Page and Dissemination sold on May 7, 2004 was purchased by Reynolds or by friends and family members of Reynolds and Mullholand.  Friends and family members accounted for over 74% of the total publicly reported purchase volume during the first five days of trading of Ecogate stock, during which time the stock price more than tripled from the initial $0.05 to $0.17 per share.

**3.     Media International Concepts, Inc. Stock Offering**

80.     In 2004, **Media International Concepts, Inc.** ("Media International") was a Nevada corporation with its principal place of business in Los Angeles, California.

81.    In February 2004, Page entered into an agreement with Media International to accomplish a public stock offering through Rule 504 of Regulation D.  Page contacted Stocker to prepare documents for the stock offering and contacted Dissemination to perform market awareness.

82.    In May, 2004, Stocker prepared corporate resolutions and subscription agreements that authorized the issuance of a total of 10,000,000 Media International shares to Page, Dissemination, and Odyssey Contracting L.L.C., a Texas limited liability company, of which Offill was a manager and member.  These subscription agreements represented that Odyssey Contracting, Page and Dissemination had made full payment for the stock. In fact, Odyssey had paid nothing, Page had paid only $25,000, and Dissemination paid nothing.

83.    On May 20, 2004, Media International issued 750,000 shares to Odyssey Contracting, 4,250,000 shares to Page, and 5,000,000 shares to Dissemination.

84.    On May 19, 2004, Offill signed a document authorizing Odyssey contracting to transfer the 750,000 Media International shares.  Offill also signed an undated stock power.  Stocker delivered the Odyssey Contracting certificate for the 750,000 Media International shares along with the signed authorization and stock power to the transfer agent and instructed the transfer agent to transfer the 750,000 shares to Curtis-Case.

85.    Stocker deposited the 750,000 Media International shares into Curtis-Case's brokerage account at Spencer Edwards, Inc.

86.    Between May 25, and June 15, 2004, Stocker sold the 750,000 shares through the Curtis-Case account at prices ranging from $0.045 to $0.10 for proceeds of approximately $48,000.

87.     Page deposited 1,000,000 Media International shares into his brokerage account at J. Alexander and 1,000,000 Media International shares into the brokerage account of Page Properties at Bishop Rosen & Co.

88.     Between May 26, 2004, and January 15, 2005, Page offered and sold approximately 1,748,000 Media International shares in the two accounts at prices ranging from $0.03 to $0.12 for total proceeds of approximately $99,946.

89.     Mullholand and Reynolds deposited 5,000,000 Media International shares into two of Dissemination's brokerage accounts at Bishop Rosen & Co. and J. Alexander.

90.     Mullholand and Reynolds offered and sold approximately 991,000 shares from Dissemination's accounts at prices ranging from $0.03 to $0.13 for proceeds of approximately $73,716.

91.     Barham introduced Mullholand and Reynolds to Fischer and ATN Enterprises. Fischer agreed to pay a referral fee to Barham for all work that Fischer received from Mullholand and Reynolds.  Fischer paid such fees out of the sales proceeds from the three offerings that Fischer worked on with Mullholand and Reynolds (Media International, Auction Mills, and CDC).  The total payments from Fischer and ATN Enterprises to Barham and Ballad Enterprises, Inc exceeded $1,000,000.

92.     On or about June 3, 2004, Dissemination transferred 2 million Media International shares to ATN Enterprises to pay for a market awareness campaign to create demand for the purchase of Media International shares.

93.     Between June 9, and September 24, 2004, Fischer offered and sold approximately 1.7 million Media International shares through ATN Enterprises' brokerage account at prices ranging from $0.015 to $0.08 for proceeds of approximately $61,933.

94.     No registration statement was filed or in effect for these offers and sales of the Media International shares by Page and Page Properties, by Mullholand and Reynolds through the Dissemination account, by Fischer through the ATN Enterprises account, or by Stocker through the Curtis-Case account.

95.     Mullholand and Reynolds advised their friends and family members when trading commenced, and induced them to purchase Media International shares that Dissemination, Page, Fischer and Stocker were selling.  They offered their Media International stock to the public through quotations on the Pink Sheets entered on their orders by broker-dealers.  Public offers and sales began on May 25, 2004.  Reynolds personally purchased 200,000 shares of Media International on May 25, 2004.  That purchase was the second trade overall for Media International stock.  Page, Dissemination, and Curtis-Case sold shares at $0.05 to $0.07 on the first day and constituted the commencement of a public market for Media International stock. Almost all of the Media International stock that Page and Dissemination sold on May 25, 2004 was purchased by Reynolds or by friends and family members of Reynolds and Mullholand. Reynolds purchased another 70,000 shares on May 27 and 28, 2004.  Friends and family members accounted for over 93% of the total publicly reported purchase volume during the first five days of trading of Media International stock, during which time the stock price tripled from the initial $0.05 to $0.15 per share.

### 4.     Vanquish Productions, Inc. Stock Offering

96.     In 2004, **Vanquish Productions, Inc.** ("Vanquish") was a Texas corporation with its principal place of business in Dallas, Texas.  Aaron Cain McKnight ("McKnight") was the founder and president of Vanquish.

97.     In or about April or May 2004, McKnight met with Mullholand and Reynolds and they agreed to raise up to $1 million for Vanquish through a public stock offering.

98.     Mullholand and Reynolds introduced Stocker to McKnight and instructed McKnight to use Stocker to prepare the paperwork for the shares of the company to be publicly traded.

99.     On or about June 3, 2004, Offill incorporated Steep Blue Holdings, Inc. ("Steep Blue") as a Texas corporation at the request of Stocker. Offill was the president, sole officer, and director.

100.    On or about June 3, 2004, Stocker prepared corporate resolutions and subscription agreements that authorized the issuance in total of 4,350,000 Vanquish shares to Steep Blue, RSMR, and Dissemination in exchange for $232,500. Stocker faxed the agreements to McKnight and he signed them. The subscription agreements represented that RSMR, Dissemination, and Steep Blue had made full payment for the stock. In fact RSMR, Dissemination, and Steep Blue had paid nothing for their stock.

101.    On or about June 7, 2004, Offill, acting as the president of Steep Blue, signed a document authorizing Steep Blue to transfer 500,000 Vanquish shares to an unnamed person or entity. Offill also signed a blank and undated stock power.

102.    On June 8, 2004, Vanquish issued 1,350,000 shares to RSMR, 2,500,000 shares to Dissemination, and 500,000 shares to Steep Blue. On that same day, Stocker delivered Steep Blue's certificate for 500,000 Vanquish shares along with the authorization and stock power signed by Offill to Vanquish's transfer agent which then transferred the 500,000 shares to Curtis-Case.

103.    Stocker deposited the 500,000 Vanquish shares into two Curtis-Case brokerage accounts at J. Alexander Securities and Spencer Edwards.

104.    Between June 9, and June 14, 2004, Stocker directed the brokers for Curtis-Case to offer

and sell the 500,000 Vanquish shares at prices that ranged from $0.15 to $0.23 for proceeds of

approximately $74,467.

105.    RSMR and Dissemination deposited their stock certificates into brokerage accounts at

Bishop Rosen & Co. and WestPark Capital Inc.

106.    Between June 10, and June 15, 2004, Mullholand and Reynolds offered and sold 460,700

Vanquish shares from Dissemination's account for proceeds of approximately $91,852.

107.    Between June 10, and August 12, 2004, Mullholand and Reynolds offered and sold

192,600 Vanquish shares from RMSR's account for proceeds of approximately $20,452.

108.    No registration statement was filed or in effect for these offers and sales of the Vanquish

shares by Mullholand and Reynolds through the RSMR and Dissemination accounts, or by

Stocker through the Curtis-Case account.

109.    Mullholand and Reynolds advised their friends and family members when trading

commenced, and induced them to purchase the Vanquish stock that they, Stocker, and others

who obtained stock from Vanquish were selling.  Almost all of the Vanquish stock that Curtis-

Case sold on June 9, 2004 was purchased by friends and family members of Reynolds and

Mullholand.  Friends and family members accounted for 72% of the total publicly reported

purchase volume during the first four days of trading of Vanquish stock, during which time the

stock price increased by approximately 75% from the initial price of $0.15 to $0.265.  During

June 2004, Reynolds, personally and through his Veruschka account, purchased 147,000 shares

of Vanquish in market trades at the same time that he, Mullholand, and Stocker were selling

Vanquish shares, and another 508,000 shares in July, before additional sales in August.

### 5.   Auction Mills, Inc. Stock Offering

110.    In 2004, **Auction Mills, Inc.** ("Auction Mills") was a Texas corporation with its principal place of business in Dallas, Texas. Jason Brola ("Brola") and Michael J. Uskovich ("Uskovich") were the founders and initial officers and directors of Auction Mills.

111.    In May 2004, Brola and Uskovich met with Reynolds and Mullholand to discuss financing for their business plan to open eBay drop-off stores. Reynolds and Mullholand agreed to raise up to $1 million through a public stock offering to launch the business of Auction Mills.

112.    On or about June 3, 2004, Offill incorporated Crimson City Holdings, Inc. ("Crimson City"), as a Texas corporation at the request of Stocker. Offill was the president, sole officer, and director of Crimson City.

113.    On or about June 23, 2004, Stocker prepared corporate resolutions and subscription agreements that authorized Crimson City, RSMR, and Dissemination to purchase a total of 4,500,000 Auction Mills shares for $180,000. The subscription agreements represented that and Crimson City, Dissemination, and RSMR had made full payment for the shares. In fact, only Dissemination had paid Auction Mills the $25,000 as represented. RSMR and Crimson City had paid nothing for their shares.

114.    On June 28, 2004, Offill, acting as the president of Crimson City, signed a document authorizing the transfer of 500,000 shares of Auction Mills shares to an unnamed person or entity. Offill also signed a blank and undated stock power.

115.    On July 8, 2004, Auction Mills issued 500,000 shares to Crimson City, 1,500,000 shares to RSMR, and 2,500,000 shares to Dissemination.

116.    Stocker delivered the Crimson City's stock certificate for the 500,000 Auction Mills shares along with the authorization and stock power signed by Offill to Auction Mills' transfer agent and instructed the transfer agent to transfer the 500,000 shares to Curtis-Case.

117.    Stocker deposited the 500,000 shares into a Curtis-Case account at J. Alexander.

118.    Stocker offered and sold the 500,000 Auction Mills shares from the account of Curtis-Case, which all sold on the first day of trading at $0.10 per share for proceeds of approximately $49,000.

119.    On or about July 15, 2004, Stocker prepared and delivered to Auction Mills' transfer agent subscription agreements authorizing Crimson City and RSMR to purchase additional shares.

120.    On or about July 15, 2004, Auction Mills issued an additional 200,000 shares to Crimson City, and additional shares to RSMR in the name of its broker-dealer: 1,665,000 shares issued on July 14, 2004, 1,050,000 shares issued on July 15, 2004, and 450,000 shares issued on July 28, 2004.

121.    On July 13, 2004, two days before the stock was issued, Offill, acting as the president of Crimson City, signed a document authorizing the transfer the 200,000 shares of Auction Mills to an unnamed person or entity.  Offill also signed an undated stock power.

122.    Stocker delivered the Crimson City stock certificate for 200,000 Auction Mills shares along with the signed authorization and stock power to the transfer agent and instructed the transfer agent to transfer the 200,000 shares to Curtis-Case.

123.    Stocker deposited the 200,000 shares into a Curtis-Case account at Spencer Edwards Inc. and sold all of them on July 16 and 19, 2004 for proceeds of approximately $159,000.

124.    RSMR deposited the 4,665,000 Auction Mills shares into its brokerage account with Bishop Rosen & Co.

125.    From on or about July 12, through September 20, 2004, Mullholand and Reynolds offered and sold approximately 4,665,000 Auction Mills shares from the brokerage account of RMSR at prices ranging from $0.10 to $2.40 for proceeds of approximately $3,990,117.

126.    Mullholand and Reynolds deposited the 2,500,000 Auction Mills shares into Dissemination's brokerage accounts at Newbridge Securities and J. Alexander.

127.    On July 9, 2004, Mullholand and Reynolds offered and sold 132,500 Auction Mills shares from Dissemination's account at J. Alexander at $0.10 per share for proceeds of approximately $12,973.  Dissemination transferred $12,242 of the proceeds to Curtis-Case.

128.    From on or about July 14, through October 31, 2004, Mullholand and Reynolds offered and sold approximately 2,362,500 Auction Mills shares (split adjusted) from the brokerage account of Dissemination at prices ranging from $0.214 to $1.08 for proceeds of approximately $2,694,260.

129.    On or about July 8, 2004, Mullholand authorized the brokerage account of Dissemination to transfer 2,000,000 Auction Mills shares to ATN Enterprises to pay for a market awareness campaign to create demand for the purchase of Auction Mills shares.

130.    During July 2004, Fischer offered and sold the 2,000,000 Auction Mills shares from the brokerage accounts of ATN Enterprises at Newbridge Securities and WestPark Capital, Inc. at prices ranging from $.798 to $2.651 for proceeds of approximately $3,038,918.

131.    No registration statement was filed or in effect for these offers and sales of the Auction Mills shares by Mullholand and Reynolds through the RSMR and Dissemination accounts, by Stocker through the Curtis-Case accounts, or by Fischer through ATN Enterprises accounts.

132.    Mullholand and Reynolds advised their friends and family members when trading commenced, and induced them to purchase the Auction Mills stock that they, Stocker, Fischer and others who obtained stock from Auction Mills were selling.  Almost all of the Auction Mills stock that Curtis-Case and Dissemination sold on July 9, 2004 was purchased by friends and family members of Reynolds and Mullholand.  Friends and family members accounted for 64% of the total publicly reported purchase volume during the first three days of trading of Auction Mills stock, during which time the stock price tripled from the initial price of $0.10 to $0.30. Reynolds, through his Veruschka account, purchased 30,000 shares of Auction Mills stock as one of the first purchasers on July 9, 2004.  Reynolds continued to buy and sell Auction Mills stock through his personal and Veruschka accounts during July through September, 2004, while he, Mullholand, Fischer, and Stocker were selling.

### 6.    **Custom Designed Compressor Systems, Inc**. **Stock Offering**

133.    In 2004, **Custom Designed Compressor Systems, Inc**. ("CDC") was a Delaware corporation with its principal place of business in Bloomfield, New Mexico.  Shelby Ball ("Ball") was a founder and initial president of CDC.

134.    During the summer of 2004, Ball met with Reynolds, Mullholand, and Fischer in Dallas, Texas to discuss financing CDC's business plan to provide compressors for use in natural gas production.  Reynolds and Mullholand agreed to raise up to $1 million to launch the business of CDC and take the company public.

135.    Mullholand introduced Ball to Stocker, and instructed him to use Stocker to prepare the paperwork for the shares of CDC to be publicly traded.

136.    Ball communicated with Stocker by telephone to complete the necessary paperwork.

137. On or about July 20, 2004, Offill incorporated Classical Movement Holdings, Inc. ("Classical Movement Holdings"), as a Texas corporation at the request of Stocker. Offill was the president, sole officer, and director of Classical Movement.

138. On or about September 2, 2004, Stocker prepared a subscription agreement authorizing Classical Movement Holdings to purchase 8,250,000 CDC shares for $82,500. The subscription agreement asserted that Classical Movement Holdings had made full payment for the stock. In fact, Classical had paid CDC nothing for the stock.

139. On that same day, Offill, acting as the president of Classical Movement Holdings, signed a document authorizing the transfer of the 8,250,000 CDC shares to an unnamed person or entity.

140. On September 21, 2004, CDC issued 8,250,000 shares to Classical Movement Holdings, Inc. On the same day, Stocker delivered the Classical Movement Holdings authorization to the transfer agent, and directed the transfer agent to transfer 500,000 shares to Curtis-Case, 2,500,000 shares to ATN Enterprises, 2,500,000 shares to Dissemination, 1,250,000 shares to a broker-dealer for the benefit of RSMR, and the balance of 1,500,000 shares to David B. Stocker IOLTA account. Stocker transferred the IOLTA shares to RSMR on September 24, 2004.

141. Stocker deposited 500,000 CDC shares into Curtis-Case's brokerage account at J. Alexander and then transferred part of the shares to SAMCO Financial Services.

142. Between September 23, and October 26, 2004, Stocker offered and sold approximately 120,937 CDC shares (split adjusted) from the Curtis-Case brokerage accounts at J. Alexander and SAMCO Financial Services at prices ranging from $2.50 to $5.25 for proceeds of approximately $439,017.

143. RSMR deposited its 2,750,000 CDC shares into its brokerage account with Bishop Rosen & Co.

144.    Between September and November 2004, Mullholand and Reynolds offered and sold approximately 870,000 CDC shares (split adjusted) from RMSR's brokerage account at prices ranging from $0.40 to $5.47 for proceeds of approximately $2,118,564.

145.    ATN Enterprises deposited its CDC shares into its brokerage accounts.

146.    Between September 24, and October 8, 2004, Fischer offered and sold 2.5 million CDC shares (split adjusted) from ATN Enterprises' brokerage account at prices ranging from $0.10 to $5.35 for proceeds of approximately $2,558,201.

147.    No registration statement was filed or in effect for these offers and sales of the CDC shares by Mullholand and Reynolds through the RSMR accounts, by Stocker through the Curtis-Case account, or by Fischer through ATN Enterprises accounts.

148.    Mullholand and Reynolds advised their friends and family members when trading commenced, and induced them to purchase the CDC shares that they, Stocker, and Fischer were selling.  RSMR, ATN Enterprises, and Curtis-Case offered their CDC stock to the public through quotations on the Pink Sheets entered on their orders by broker-dealers.  Public offers and sales began on September 24, 2004 with sales by RSMR, and ATN Enterprises also made sales on the first day of trading.  Curtis-Case began selling on the third trading day, September 28, 2004. Friends and family members accounted for 64% of the total publicly reported purchase volume during the first three days of trading of CDC stock, during which time the stock price quintupled from the initial price of $0.50 to $2.50.  Reynolds, personally and through his Veruschka account, purchased 27,100 shares of CDC stock on September 27 and 29, 2004 and made additional purchases in October while he, Mullholand, Fischer, and Stocker were selling.

149.     On or about September 28, 2004, Stocker directed the bank account of Curtis-Case to wire transfer $249,985 to the trust account of the law firm where Offill worked as payment for Offill's services, including incorporating the three Texas corporations.

### FIRST CLAIM FOR RELIEF
#### Offer and Sale of Unregistered Securities
#### in Violation of Sections 5(a) and 5(c) of the Securities Act

150.     Paragraphs 1 through 149 are hereby realleged and incorporated by reference.

151.     The shares of ATFT, Ecogate, Media International, Vanquish, Auction Mills, and CDC that the defendants offered and sold to public investors are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 2(10) the Exchange Act, 15 U.S. C. §§ 77b(a)(1) and 78(b)(10).

152.     Stocker, Offill, Curtis-Case, Mullholand, Reynolds, RSMR, Dissemination, Page, Page Properties, Fischer, and ATN Enterprises, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise, or caused to be carried through the mails or in interstate commerce by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale when no registration statement was in effect as to those securities.

153.     Stocker, Offill, Curtis-Case, Mullholand, Reynolds, RSMR, Dissemination, Page, Page Properties, Fischer, and ATN Enterprises, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities through the use or medium of a prospectus or otherwise, when no registration statement had been filed for those securities.

154.    By reason of the foregoing conduct Stocker, Offill, Curtis-Case, Mullholand, Reynolds,

RSMR, Dissemination, Page, Page Properties, Fischer, and ATN Enterprises have each violated

and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the

Securities Act , 15 U.S.C. §§ 77e(a) and 77e(c).

## SECOND CLAIM FOR RELIEF
### Acting As an Unregistered Broker-Dealers
### in Violation of Section 15(a) of the Exchange Act

155.    Paragraphs 1 through 149 are hereby realleged and incorporated by reference.

156.    In connection with their offer and sale of the securities of one or more of the six

companies discussed above, Mullholand, Reynolds, RSMR, Dissemination, Page, and Page

Properties acted as brokers or dealers engaged in the regular business of effecting transactions in

securities for the account of others, or buying and selling securities for their own accounts.

Mullholand, Reynolds, RSMR, Dissemination, Page, and Page Properties made use of the mails

or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or

attempt to induce the purchase or sale of securities while they were not registered with the

Commission as a broker-dealer or associated with a broker-dealer.

157.    By reason of the conduct described in paragraphs 155 and 156, Defendants Mullholand,

Reynolds, Page, RSMR, Dissemination, Page, and Page Properties, have each violated and,

unless restrained and enjoined, will continue to violate Section 15(a)(1) of the Exchange Act, 15

U.S.C. § 78o(a)(1).

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment of Relief Defendants

158.    Paragraphs 1 through 149 are hereby realleged and incorporated by reference.

159.    Barham, Ballad Enterprises and Bellatalia obtained funds as part, and in furtherance of

the securities violations alleged above, and under those circumstances it is not just, equitable or

conscionable for them to retain the funds.  Barham, Ballad Enterprises and Bellatalia were unjustly enriched.

160.    By reason of the conduct described above in paragraphs 158 though 199, Barham, Ballad Enterprises and Bellatalia should be ordered to disgorge the funds they received as a result of the defendants' violations of the federal securities laws.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Find that the Defendants, and each of them, committed the violations alleged.

**II.**

Enter an Order of Permanent Injunction as to each defendant, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining each defendant from further violations of the provisions of law and rules alleged in this complaint.

**III.**

Enter an Order requiring the defendants and relief defendants to prepare an accounting of the proceeds they obtained from the offers and sales of the six companies described above.

**IV.**

Enter an Order requiring defendants to disgorge all ill-gotten gains resulting from their participation in the conduct described above, including pre-judgment and post judgment interest.

**V.**

Enter an Order requiring all defendants to pay third-tier civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 77t(d) and 78u(d)(3).

## VI.

Enter an Order barring all defendants from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act and Section 21 of the Exchange Act, 15 U.S.C. §§

77t(g) and 78u(d)(6).

## VII.

Enter an Order requiring Barham, Ballad Enterprises, and Bellatalia to disgorge funds

that they received that were the proceeds of illegal activities of other defendants.

## VIII.

Grant such further equitable relief as this Court deems appropriate and necessary.

Dated:  September 25, 2007

Respectfully submitted,

Leslie J. Hughes
Colorado Bar No. 15043

Attorney for the United States
Securities and Exchange Commission
Denver Regional Office
1801 California Street, Suite 1500
Denver, CO  80202-2656
Telephone: 303-844-1000
Fax: 303-844-1068
E-mail: HughesLJ@sec.gov

31

%JS 44   (Rev. 10/06)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**3-07 CV 1643-D**

## I. (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

## DEFENDANTS

PHILLIP W. OFFILL, JR., et al.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____ Dallas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

RECEIVED
SEP 26 2007
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Leslie J. Hughes, SEC, 1801 California Street, Suite 1500
Denver, CO 80202   (303) 844-1000

Attorneys (If Known)

See Attached

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☒ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Sections 77(e) and 78o(a)
Brief description of cause:
Selling securities with no registration filed, Effecting transactions in securities without registration as a broker-dealer

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) PENDING OR CLOSED   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   September 25, 2007

SIGNATURE OF ATTORNEY OF RECORD   Leslie J. Hughes

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____